# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EPSILON ENERGY USA, INC.,       No. 3:18-cv-01852-RDM

        Plaintiff,        Electronically Filed

   vs.

CHESAPEAKE APPALACHIA,
L.L.C.,

        Defendant.


## DEFENDANT CHESAPEAKE APPALACHIA, L.L.C.'S BRIEF IN OPPOSITION TO PLAINTIFF EPSILON ENERGY USA INC.'S MOTION FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF

Nicolle R. Snyder Bagnell
Pa. I.D. No. 87936
Kevin C. Abbott
Pa I.D. No. 35734
Stefanie L. Burt
Pa. I.D. No. 312998
Lucas Liben
Pa. I.D. No. 309527
225 Fifth Avenue
Pittsburgh, PA 15222
Tel: (412) 288-3131
Fax: (412) 288-3063

# TABLE OF CONTENTS

**Page**

BACKGROUND ..................................................................................................2

LEGAL STANDARDS ........................................................................................6

ARGUMENT ......................................................................................................7

I.     EPSILON WILL NOT SUFFER IRREPARABLE HARM
WITHOUT INJUNCTIVE RELIEF BECAUSE MONETARY
DAMAGES ARE AN ADEQUATE REMEDY AT LAW. ..........................7

     A.     Epsilon Cannot Meet the Stringent Irreparable Harm Standard
the Third Circuit Applies in Breach of Contract Cases. ......................8

     B.     Epsilon's Claims of Irreparable Harm are Belied By the
Monetary Damages it Seeks in Its Breach of Contract Claim. .............9

     C.     Epsilon's Claims of Irreparable Harm to Its Property Interests
Ignore Pennsylvania Law. ...................................................................11

II.    CHESAPEAKE WILL SUFFER SIGNIFICANT HARM IF THE
COURT GRANTS INJUNCTIVE RELIEF..................................................13

III.   GRANTING INJUNCTIVE RELIEF WILL HARM THIRD
PARTIES AND IS NOT IN THE PUBLIC INTEREST. ............................15

IV.   EPSILON DOES NOT HAVE A LIKELIHOOD OF SUCCESS ON
THE MERITS OF ITS BREACH OF CONTRACT CLAIMS. ...................18

     A.     Epsilon Cannot Meet the Stringent Standards Applied for
Assessing its Likelihood of Success on the Merits. ............................19

     B.     Epsilon Does Not Have a Likelihood of Success On the Merits
Because Chesapeake Did Not Breach the JOAs. ................................19

          (i)     The JOAs Contain An Exculpatory Clause That Relieves
the Operator, Chesapeake, From Contract Liability.................19

(ii)    Chesapeake Did Not Breach the JOAs By Not Drilling the Epsilon Wells Because Epsilon Did Not Re-Submit Its Proposal for Them, as Required Under the JOAs...............21

(iii)    Chesapeake Did Not Breach Any Required Process in the JOAs in Proposing the Allocation Wells Because the Allocation Wells and the Epsilon Wells Do Not Conflict........23

(iv)    Chesapeake Did Not Breach or "Unilaterally Amend" the JOAs in Proposing the Allocation Wells, and Epsilon's Non-Consent Precludes Further Challenge..............................25

V.    IF THE COURT GRANTS THE MOTION, WHICH IT SHOULD NOT, IT SHOULD REQUIRE EPSILON TO POST A SIGNIFICANT BOND...................................................................................26

CONCLUSION ......................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.K. Corp. v. Columbia Pictures & Indus., Inc.*,
  400 F.2d 761 (3d Cir. 1971) ................................................................. 9

*Acierno v. New Castle County*,
  40 F.3d 645 (3d Cir. 1994) ......................................................... 8, 9, 12

*American Telephone & Telegraph Co. v. Winback and Conserve
  Program, Inc.*,
  42 F.3d 1421 (3d. Cir. 1994) ............................................................... 7

*Anchel v. Shea*,
  762 A.2d 346 (Pa. Super. 2000) ....................................................... 20

*In re Arthur Treacher's Franchisee Litigation*,
  689 F.2d 1137 (3d Cir. 1982) ........................................................ 8, 10

*Beberman v. U.S. Dep't of State*,
  675 Fed. App'x 131 (3d Cir. 2017) .................................................... 8

*Bohm v. Straw*,
  2013 WL 100441 (W.D. Pa. Jan. 8, 2013) .......................................... 6

*Cobell v. Norton*,
  226 F. Supp. 2d 1 (D.D.C. 2002) ..................................................... 16

*Continental Group, Inc. v. Amoco Chemicals Corp.*,
  614 F.2d 351 (3d Cir. 1980) ............................................................... 8

*Delaware Port Authority v. Transamerican Trailer Transport, Inc.*,
  501 F.2d 917 (3d Cir. 1974) ............................................................. 16

*Doe v. Calcutta*,
  592 F.2d 704 (3d Cir. 1979) ............................................................. 16

*East Tennessee Natural Gas Co. v. Sage*,
  361 F.3d 808 (4th Cir. 2004) ........................................................... 16

*United States ex rel. Greenmoor, Inc. v. Travelers Cas. & Sur. Co. of Am.*,
    2009 WL 4730233 (W.D. Pa. Dec. 4, 2009) ......................................................21

*Guardian Pipeline, LLC v. 295.49 Acres of Land*,
    2008 WL 1751358 (E.D. Wis. Apr. 11, 2008) ...............................................17

*Gulf Crossing Pipeline Co. v. 86.36 Acres of Land*,
    2008 WL 2465892 (W.D. La. June 18, 2008) ...............................................17

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
    607 F.3d 453 (7th Cir. 2010) ...........................................................................27

*Halide Group, Inc. v. Hyosung Corp.*,
    2010 WL 4456928 (E.D. Pa. Nov. 8, 2010) .....................................................9

*Hoxworth v. Blinder, Robinson & Co., Inc.*,
    903 F.2d 186 (3d Cir. 1990) ...........................................................................14

*Instant Air Freight v. C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989) .............................................................10, 26, 27

*J. Corman Family LP v. Devon Energy Production Co.*,
    2017 WL 4053858 (W.D. Okla Sept. 13, 2017) ...............................................9

*J&S Development Corp. v. Montrose Global Assets, Inc.*,
    279 Fed. App'x 131 (3d Cir. 2008) .................................................................14

*Lichtenfels v. Bridgeview Coal Co.*,
    344 Pa. Super. 257, 496 A.2d 782 (1985) .......................................................12

*Markowicz v. SWEPI, LP*,
    940 F. Supp. 2d 222 (M.D. Pa. 2014).............................................................12

*Medical Marketing Consultants, LLC v. Cardiac Telecom Corp.*,
    2007 WL 1811188 (W.D. Pa. May 31, 2007) ................................................10

*N. Am. Commc'ns v. Herman*,
    2018 WL 1229709 (W.D. Pa. Mar. 8, 2018) ..................................................14

*Ouachita Watch League v. U.S. Forest Serv.*,
    2014 WL 11498055 (E.D. Ark. Dec. 15, 2014) .............................................17

*Pella Prods., Inc. v. Pella Corp*,
  2018 WL 2734820 (M.D. Pa. June 7, 2018)......................................................27

*Persaud v. Exxon Corp.*,
  867 F. Supp. 128 (E.D.N.Y. 1994) .....................................................................15

*Reeder v. Wood County Energy, LLC*,
  395 S.W.3d 789 (Tex. 2012) ..............................................................................20

*Rosa-Diaz v. Harry*,
  2017 WL 7038469 (M.D. Pa. Dec. 21, 2017) .......................................................7

*Sabal Trail Transmission, LLC v. +/- 2.62 Acres of Land in Hamilton*
  *County Florida*,
  2016 WL 3188976 (M.D. Fla. June 8, 2016) ......................................................27

*Shavei-Tzion v. Cadles of Grassy Meadows, II, LLC*,
  2017 WL 2463171 (M.D. Pa. June 7, 2017) (Mannion, J.).................................7

*Stine v. Marathon Oil. Co.*,
  976 F.2d 254 (5th Cir. 1992) ..............................................................................20

*Susquehanna Commercial Fin., Inc. v. Vascular Res., Inc.*,
  2010 WL 95127 (M.D. Pa. Jan. 6, 2010)...........................................8, 14, 19, 26

*Synthes, Inc. v. Gregoris*,
  228 F. Supp. 3d 421 (E.D. Pa. 2017)..................................................................13

*Transcon. Gas Pipe Line Co. v. Permanent Easements for 5.67 Acres*,
  2017 WL 3412374 (M.D. Pa. Aug. 9, 2017) ...............................................17, 26

*Trumbull Corp. v. Boss Constr., Inc.*,
  801 A.2d 1289 (Pa. Cmwlth. 2002)....................................................................22

*Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*,
  342 F.3d 191 (3d Cir. 2003) .................................................................................6

*Walker v. O'Bannon*,
  487 F. Supp. 1151 (W.D. Pa. 1980).....................................................................6

*Walney v. SWEPI LP*,
  2018 WL 4076919 (W.D. Pa. Aug. 27, 2018)....................................................24

*Winter v. NRDC, Inc.*,
  555 U.S. 7, 129 S.Ct. 365 ......................................................................6

**Rules**

Fed. R. Civ. P. 65(c)............................................................................6, 26

**Other Authorities**

1 Kuntz, Law of Oil and Gas § 5.6 .........................................................12

Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 5.3 (Matthew
  Bender, Rev. Ed.)..............................................................................11

Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and
  Gas Law* § 502 (LexisNexis Matthew Bender 2012) ........................11

Williams & Meyers, Manual of Oil and Gas Terms, 372 (2003)............19

Epsilon Energy USA Inc.'s ("Epsilon") filed a Motion for Temporary and Preliminary Injunctive Relief (the "Motion") asking this Court for extraordinary relief to prevent Chesapeake Appalachia, L.L.C. ("Chesapeake") from drilling certain wells and continuing its business operations because of a contractual dispute between the parties. The Court should deny the Motion. Epsilon has not and cannot meet the stringent factors that it must prove to obtain preliminary injunctive relief. Preliminary injunctive relief is not justified unless the moving party demonstrates that it will suffer irreparable harm. Epsilon has not and cannot meet this burden because there is no irreparable harm. This is a contract dispute where adequate money damages are available to Epsilon and, in fact, Epsilon has pleaded that it is entitled to actual damages. Although in its Motion Epsilon attempts to transform its breach of contract claim into one allegedly affecting property rights, there is no factual or legal support for this claim. On this basis alone, Epsilon's request for preliminary injunctive relief has no merit and must fail.

Even if the Court looks past this fatal deficiency to Epsilon's Motion, none of the other factors warrant a preliminary injunction. Granting the injunctive relief will cause Chesapeake to suffer irreparable harm because its schedule for drilling and operating the wells will be significantly delayed, thereby jeopardizing their completion and the beneficial use and enjoyment of Chesapeake's oil and gas leasehold interests. Similarly, third-parties and the public interest will be harmed if

injunctive relief is granted. Other working interest owners under the contracts and the royalty owners in the applicable units, none of whom are parties to this injunction proceeding, will not receive payments for production related to Chesapeake's proposed wells, and the public will be deprived of a necessary natural gas supply. Finally, Epsilon does not have a likelihood of success on the merits of its contract claims because it cannot show that Chesapeake breached the contracts.

Epsilon cannot meet its heavy burden for injunctive relief, and the Court should therefore deny the Motion. If the Court grants the Motion, which it should not, Chesapeake requests that Epsilon post a bond in the amount of at least $22,000,000 to secure the costs that Chesapeake will incur.

## **BACKGROUND**

Chesapeake and Epsilon, among others, are parties to JOAs for the exploration and development of oil and gas underlying land in Susquehanna County, Pennsylvania. *See* Compl. ¶ 12. The first relevant JOA, dated July 6, 2010, is for a pooled unit known as the Cannella North Unit (the "Cannella North JOA"). *Id.* ¶ 13, Exhibit 1. Epsilon has a 25.6 percent working interest in the Cannella North JOA, and Chesapeake has a 40.5 percent working interest. *Id.* The second relevant JOA, dated July 12, 2010, is for a pooled unit known as the Rylee North Unit (the "Rylee North JOA"). *Id.* ¶ 14, Exhibit 2. Epsilon has a 1.58 percent working interest in the Rylee North JOA, and Chesapeake has a 64.1 percent working interest. *Id.* The

third relevant JOA, dated June 10, 2014 is for a pooled unit known as the Cannella South Unit (the "Cannella South JOA"). *Id.* ¶ 17, Exhibit 5. Epsilon has a 4.07 percent working interest in the Cannella South Unit, and Chesapeake has a 48.2 percent working interest. *Id.*

On February 8, 2018, Epsilon proposed two wells to be drilled, one in the Cannella North Unit pursuant to the terms of the Cannella North JOA, and one in the Cannella South Unit pursuant to the terms of the Cannella South JOA (the "Epsilon Wells"). *See, e.g.*, *id.* ¶ 48.[1] The Epsilon Wells targeted the Lower Marcellus Formation. *Id.* ¶¶ 58-59. On March 8, 2018, within the 30-day notice period required under the Cannella North JOA and the Cannella South JOA (the "Cannella JOAs"), Chesapeake elected to participate in and operate the Cannella North Unit and the Cannella South Unit, but did *not* intend to participate in and operate the Epsilon Wells. *See* Declaration of Courtney Moad ("Moad Decl.") ¶ 6. Chesapeake's intention was made clear in its March 8, 2018 election and in subsequent discussions with Epsilon. *Id.* The other parties to the Cannella South JOA elected to participate in the Epsilon Wells. *See* Compl. ¶ 50. Commencement of the Epsilon Wells did not occur within 90 days following the expiration of the 30-day notice period. *See, e.g.*, *id.* ¶¶ 51-52. After these 90 days elapsed, however,

---

[1] Epsilon also proposed another well to be drilled in the Cannella South Unit pursuant to the terms of the Cannella South JOA ("Cannella 6H"). *See* Compl. ¶ 48.

neither Epsilon nor any other party resubmitted a proposal for the Epsilon Wells, as required under the Cannella JOAs, and therefore, the plans to drill and operate them lapsed. *See* Article V.B.1.; Moad Decl. ¶ 7.

On August 15, 2018, Chesapeake proposed three wells to the other parties to the JOAs. *See* Compl. ¶¶ 49, 53, Exhibit 9. The first well was the same as Cannella 6H. *Id.* ¶ 49. The two other wells crossed into both the Cannella South Unit and the Rylee North Unit (the "Allocation Wells"). *Id.* ¶ 54. Unlike the Epsilon Wells, the Allocation Wells target the Upper Marcellus Formation. *Id.* ¶ 58.[2] The Allocation Wells will not traverse any lease in which Epsilon has an interest.[3] *See* Moad Decl. ¶ 9; *see also id.*, Exhibit 2 (map of Allocation Wells).

Also on August 15, 2018, Chesapeake sent the parties to the JOAs an Allocation Consent Agreement (the "Allocation Agreement"), which proposed the method and formula by which the costs and production of the Allocation Wells would be allocated among the parties. *See* Compl. ¶ 56, Exhibit 10. For both of the Allocation Wells, an Allocation Factor would first be determined by dividing the length of the portion of the productive drainhole length of the Allocation Well that

---

[2] Chesapeake does not concede the allegation in Paragraph 58 of the Complaint that the Upper Marcellus Formation is less productive than the Lower Marcellus Formation. *See* Compl. ¶ 58.

[3] Each party to a JOA do not necessarily have an actual interest in every lease within the area covered by the JOA. Rather, certain parties only have actual interests in certain leases within the area covered by the JOA.

lies within each respective unit by the entire productive drainhole length of the Allocation Well. *Id.* Second, the Allocation Factor would be multiplied by each party's working and net revenue interest in each unit. *Id.* Third, the equation for each unit would be summed together to determine each party's respective working and net revenue interest for the Allocation Well. *Id.* Through the use of this formula, no party's interest in either JOA was reduced. *See* Moad Decl. ¶ 13. The Allocation Agreement stated that besides this method and formula, the JOAs would continue to govern the rights and obligation of the parties. *See* Compl., Exhibit 10.

On September 14, 2018, Epsilon advised Chesapeake that it did not consent to the Allocation Wells or the Allocation Agreement. *Id.* ¶ 63, Exhibit 11. Epsilon asserted that under the Cannella South JOA, Chesapeake was required to propose the Allocation Wells within 30 days of Epsilon's proposal of the Epsilon Wells because they conflicted. *Id.* ¶ 65, Exhibit 11. Second, Epsilon asserted that under the Cannella JOAs, Chesapeake was required to, but did not, commence operations on the Epsilon Well's within 90 days of the parties' consent. *Id.*, Exhibit 11. Third, Epsilon asserted that the JOAs do not permit cross-unit wells, such as the Allocation Wells, and that all parties to the JOAs were required to execute the Allocation Agreement before Chesapeake could drill the Allocation Wells. *Id.* ¶ 64, Exhibit 11. Last, while Epsilon demanded that Chesapeake drill the Epsilon Wells, *see id.*, Exhibit 11, Epsilon did not re-propose them, as was required under the JOAs. *See*

Moad Decl. ¶ 7. Notwithstanding Epsilon's objections, every other party to the JOAs consented to the Allocation Wells. *See id.* ¶ 14.

## **LEGAL STANDARDS**

A court may enter preliminary injunction if the moving party demonstrates: (1) a likelihood of success on the merits; (2) the extent to which it will suffer irreparable harm without injunctive relief; (3) the extent to which the non-moving party will suffer irreparable harm if the injunction is issued; and (4) that granted relief will be in the public interest. *See, e.g.*, *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.E.2d 249 (2008); *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 342 F.3d 191, 196 (3d Cir. 2003). The court may require the party moving for a preliminary injunction to post a bond sufficient to compensate the adverse party for any losses. *See* Fed. R. Civ. P. 65(c).[4]

The Court should issue injunctive relief *only* if the movant produces sufficient evidence to convince the trial judge that all four factors favor injunctive relief. *See Bohm v. Straw*, 2013 WL 100441, at *11 (W.D. Pa. Jan. 8, 2013). The grant of injunctive relief is an "extraordinary remedy which should be granted only in limited circumstances." *American Telephone & Telegraph Co. v. Winback and Conserve*

---

[4] Although the elements are the same, Epsilon's request for a temporary restraining order is mooted by the passage of the 14 days specified in Fed. R. Civ. P. 65(b)(2) and the Court's holding of a hearing for Epsilon's request for a preliminary injunction. *See Walker v. O'Bannon*, 487 F. Supp. 1151, 1153 (W.D. Pa. 1980).

*Program, Inc.*, 42 F.3d 1421, 1426-27 (3d. Cir. 1994). Indeed, the moving party "bears a heavy burden on a motion for preliminary injunction." *Rosa-Diaz v. Harry*, 2017 WL 7038469, at *3 (M.D. Pa. Dec. 21, 2017). Epsilon cannot meet any of the elements for a preliminary injunction, and the Court should deny the Motion. If the Court grants the Motion, it should require Epsilon to post a bond that will compensate Chesapeake for the significant delay damages that it will incur.

## ARGUMENT

I.  **EPSILON WILL NOT SUFFER IRREPARABLE HARM WITHOUT INJUNCTIVE RELIEF BECAUSE MONETARY DAMAGES ARE AN ADEQUATE REMEDY AT LAW.**

Epsilon cannot show that it will suffer irreparable harm without injunctive relief and, absent this necessary showing, Epsilon's request for an injunction must fail. *See Shavei-Tzion v. Cadles of Grassy Meadows, II, LLC*, 2017 WL 2463171, at *4 (M.D. Pa. June 7, 2017) (Mannion, J.) (denying preliminary injunction where there was no irreparable harm). In the Complaint, Epsilon seeks monetary damages. Those monetary damages are an adequate remedy for the alleged breach of contract claim. Epsilon attempts to transform its breach of contract claim into one involving its property interests that, absent injunctive relief, will allegedly be harmed by Chesapeake, one of its co-tenants under the JOAs. However, in doing so, Epsilon ignores that it has no interests in the leases through which the Allocation Wells will traverse, and even if it did have such an interest, ignores this Court's recognition that

Pennsylvania law authorizes a co-tenant to produce oil and gas without the consent of the other co-tenants. Even where a co-tenant engages in conduct that deprives the other co-tenants of their mineral rights, which Chesapeake does not concede occurred here, damages are the appropriate, and adequate, remedy.

### A.   Epsilon Cannot Meet the Stringent Irreparable Harm Standard the Third Circuit Applies in Breach of Contract Cases.

"Irreparable harm" is a harm that cannot be remedied by the payment of damages. *See, e.g.*, *Beberman v. U.S. Dep't of State*, 675 Fed. App'x 131, 134 (3d Cir. 2017). An injury warranting a preliminary injunction must "be of a peculiar nature, so that compensation in money cannot atone for it." *See Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994). Establishing a risk of irreparable harm is not enough; rather, a plaintiff has the burden of proving a "clear showing of immediate irreparable harm." *See Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir. 1980).

"In a contract dispute, where damages are a readily available remedy, proving irreparable harm entails specific and compelling proof since it is well established that a plaintiff in a breach of contract case cannot routinely convert monetary harm into irreparable harm." *Susquehanna Commercial Fin., Inc. v. Vascular Res., Inc.*, 2010 WL 95127, at *6 (M.D. Pa. Jan. 6, 2010); *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1145 (3d Cir. 1982) ("[W]e have never upheld an injunction where the claimed injury constituted a loss of money, a loss capable of

recoupment in a proper action at law."); *J. Corman Family LP v. Devon Energy Production Co.*, 2017 WL 4053858, at *1 (W.D. Okla Sept. 13, 2017) ("This is an ideal case for monetary damages. Plaintiff alleges that Defendant has violated – and continues to violate – a Joint Operating Agreement.").

When the claim is based on a breach of contract, irreparable injury may only be found in two situations: (1) where the subject matter of the contract is of such a special nature or peculiar value that damages would be inadequate; or (2) where because of some special and practical features of the contract, it is *impossible* to ascertain the legal measure of loss so that money damages are impracticable. *See A.L.K. Corp. v. Columbia Pictures & Indus., Inc.*, 400 F.2d 761, 763 (3d Cir. 1971). However, "[a]n inability to precisely measure financial harm does not make that harm irreparable or immeasurable." *Acierno*, 40 F.3d at 655; *Halide Group, Inc. v. Hyosung Corp.*, 2010 WL 4456928, at *5 (E.D. Pa. Nov. 8, 2010) ("[W]hile it may be difficult to determine the amounts that Hyosung may have received if Hyosung has used the License without having a right to do so, money damages can compensate Halide for any harm that it may have suffered."). Epsilon cannot meet this strict standard. There is no irreparable harm.

**B. Epsilon's Claims of Irreparable Harm are Belied By the Monetary Damages it Seeks in Its Breach of Contract Claim.**

In its Verified Complaint, Epsilon asserts it is entitled to money damages in its breach of contract claim related to the Epsilon Wells and the Allocation Wells.

*See* Count VI, WHEREFORE Clause (requesting "actual damages representing the harm Epsilon has suffered as a result of [Chesapeake's] refusal to commence operations on the Cannella Wells and [Chesapeake's] affirmative steps towards operating the Allocation Wells[.]").  Epsilon therefore cannot claim that it "is incapable of measuring the damages caused by [Chesapeake's] disruption of its mineral-extraction efforts." *See* Epsilon Brief at 19.  Even when not contradicted by the plaintiff's own pleadings, courts routinely reject such generalized statements as the basis for a claim of irreparable harm.  *See Instant Air Freight v. C.F. Air Freight, Inc.*, 882 F.2d 797, 803 (3d Cir. 1989) (holding that plaintiff failed to prove irreparable harm where it had "no clear factual record apart from general statements to the effect that [plaintiff] will no longer exist as a result of the termination."); *In re Arthur Treacher's Franchise Litigation*, 689 F.2d at 1146 (holding that alleged imminent threat of bankruptcy was insufficient to constitute irreparable injury where record consisted principally of general statements pertaining to refusal of franchisees to pay royalties); *Medical Marketing Consultants, LLC v. Cardiac Telecom Corp.*, 2007 WL 1811188, at *8 (W.D. Pa. May 31, 2007) (denying injunctive relief where the court did "not have any evidence before it to suggest that the demise of [plaintiff] was imminent").  This court should similarly reject Epsilon's unsubstantiated, and self-contradicted, claims of irreparable harm.

**C.     Epsilon's Claims of Irreparable Harm to Its Property Interests Ignore Pennsylvania Law.**

Epsilon next claims that it will be irreparably harmed absent injunctive relief because Chesapeake will somehow impair its mineral rights underlying the Cannella South Unit and the Rylee North Unit by drilling the Allocation Wells.  This claim ignores that Epsilon does not hold any interests in the leases through which the Allocation Wells will traverse.  *See* Moad Decl. ¶ 9; *see also id.*, Exhibit 2.  Epsilon has failed to cite any Pennsylvania law for its proposition that by virtue of its participation in the JOAs, it has gained some undefined property right in the oil and gas leases that the Allocation Wells will traverse.  *See* Epsilon's Brief at 20.  Epsilon has failed to establish *any* harm to its property and, in fact, its property rights are unaffected by the Allocation Wells.  Even if its participation in the JOAs vests Epsilon with some ownership in the gas attributable to the leases through which the Allocation Wells will traverse, this is insufficient to establish irreparable harm.  As this Court has explained:

> Pennsylvania long has been recognized as counting among the majority of states permitting "a cotenant in the fee . . . to explore for and produce oil and gas without consent of his cotenants."  Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 5.3 (Matthew Bender, Rev. Ed.).  *See also* Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law* § 502 (LexisNexis Matthew Bender 2012) (including Pennsylvania among "a majority of the producing states [in which] a concurrent owner, at least under some circumstances, has been given the power to lease and develop his interest in the land concurrently owned," and explaining that the "non-consenting cotenant is legally disabled from enjoining the drilling cotenant's operations"); *Lichtenfels*

*v. Bridgeview Coal Co.,* 344 Pa. Super. 257, 263, 496 A.2d 782, 785 (1985) ("Another special rule relating to the mineral estate is that a tenant cannot restrain a cotenant with an undivided interest in the land from realizing the value of the estate by producing or consuming the underlying minerals.").

*Markowicz v. SWEPI, LP*, 940 F. Supp. 2d 222, 228 (M.D. Pa. 2014).  Even in cases where the operator wrongfully excludes his co-tenants, such conduct may be remedied by damages.  *See* 1 Kuntz, Law of Oil and Gas § 5.6 ("[I]n a jurisdiction in which a co-tenant is privileged to extract minerals without the consent of his co-tenants [Pennsylvania], the action may be one for *damages* . . . if the co-tenant denies the interests of his co-tenants and attempts to exclude them." (emphasis added)); *id.* ("If, however, the operating co-tenant denies the rights of his co-tenants, his entry is wrongful and he will be liable *for resulting damages*." (emphasis added)); *Acierno*, 40 F.3d at 655 ("[W]e think any actionable harm he may suffer, if it is ultimately determined that the County violated his *constitutional rights*, can be remedied by an award of money damages.").

Further, Chesapeake's drilling and production of the Allocation Wells will not in any way preclude the drilling and production of the Epsilon Wells, in the event they are re-submitted and pursued by the parties to the JOAs.  This is not a basis for any claim of irreparable harm.  The Allocation Wells and the Epsilon Wells target separate and distinct zones in the Marcellus Formation.  *See* Declaration of Sheldon Burleson ("Burleson Decl.") ¶¶ 4-7.  The drilling and production of the Allocation

Wells would therefore have no impact on the Epsilon Wells. *See id.* ¶¶ 7-9. Contrary to Epsilon's claims, the Auburn Gas Gathering system (the "Auburn GGS") and the well pad that would serve the Allocation Wells and the Epsilon Wells can already accommodate, or can be adjusted to accommodate, both proposals. *See id*. ¶¶ 10-15. In sum, Epsilon has failed to carry its burden under the Third Circuit's stringent standards for establishing irreparable harm in breach of contract cases such as this one.

## II. CHESAPEAKE WILL SUFFER SIGNIFICANT HARM IF THE COURT GRANTS INJUNCTIVE RELIEF.

Chesapeake will suffer significant harm from the delay in the schedule of the Allocation Wells in the event that the Court grants the injunctive relief Epsilon seeks in the Motion. Also, even applying Epsilon's flawed theory of irreparable harm, Chesapeake, who, unlike Epsilon, *does* have an interest in the leases through which the Allocation Wells will traverse, would be the one allegedly deprived of its property rights. "A basic purpose behind the balancing of the equities analysis is to ensure that the issuance of an injunction would not harm the [nonmovant] more than a denial would harm the movant." *Synthes, Inc. v. Gregoris*, 228 F. Supp. 3d 421, 445 (E.D. Pa. 2017) (citations omitted). Courts in the Third Circuit hold that injunctive relief that significantly impacts a defendant's operations constitutes irreparable harm. *See N. Am. Commc'ns v. Herman*, 2018 WL 1229709, at *4 (W.D.

Pa. Mar. 8, 2018).  Further, contrary to Epsilon's claims, courts routinely evaluate the harm that injunctive relief will pose to defendants' economic interests:

> [G]ranting this preliminary injunction, which would effectively freeze $3,000,000 in the Defendant's working capital for the pendency of this litigation, could severely harm the defendant's interests.  Given the substantial, and currently unresolved, legal and factual questions relating to the ultimate validity of Susquehanna's complaint, this factor also weighs heavily against granting the Plaintiff extraordinary relief at this time.

*Susquehanna Commercial Fin.*, 2010 WL 95127, at *8 (citing *J&S Development Corp. v. Montrose Global Assets, Inc.*, 279 Fed. App'x 131, 133 (3d Cir. 2008); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186 (3d Cir. 1990) ("As to the possibility of harm to defendants, given the volatility and competitiveness of financial markets, we cannot take seriously the district court's findings that defendants would not be harmed by an injunction encumbering at least tens of millions of dollars of their assets.")).

An injunction would harm Chesapeake far more than a denial would harm Epsilon.  In the event the Court were to grant the Motion, Chesapeake's operations would be significantly affected, and it would suffer damages in the amount of at least $10,913,824.  *See* Burleson Decl. ¶¶ 16-17.  If Chesapeake is unable to drill and complete the Allocations Wells by June 15, 2019, which will likely be the case if any preliminary injunction is granted, then the Cannella South Unit and the Rylee North Unit must be reduced in size.  *See* Moad Decl. ¶ 12.  As a result, leases in the

Rylee North Unit will expire, and Chesapeake will lose at least two additional wells in that unit. *Id.*, Exhibit 1; Burleson Decl. ¶¶ 16-17. The total value lost of two Lower Marcellus wells just to Chesapeake will be $10,913,824, and the total value lost to the all the working interest owners in the Rylee North JOA, besides Epsilon, will be $22,031,654. *See* Burleson Decl. ¶ 17.

Further, applying Epsilon's flawed rationale of what constitutes irreparable harm in this context, an injunction would actually irreparably harm Chesapeake because it would prevent Chesapeake from making use of its own property rights by drilling the Allocation Wells through the leases in which it, and not Epsilon, has an interest. *Cf. Persaud v. Exxon Corp.*, 867 F. Supp. 128, 141 (E.D.N.Y. 1994) (holding that a real property owner's inability to make productive use of its own property may constitute irreparable harm). The balance of the equities weighs in favor of denying the Motion, denying the injunction, and permitting Chesapeake to proceed with its development of the Allocation Wells.

## III. GRANTING INJUNCTIVE RELIEF WILL HARM THIRD PARTIES AND IS NOT IN THE PUBLIC INTEREST.

Granting injunctive relief will harm third parties, namely other working interest owners in the JOAs and royalty owners in the applicable units, who will be deprived of payments related to production if the Allocation Wells are not drilled and operated. The public interest will also be harmed if the Court grants the

injunctive relief Epsilon seeks in the Motion because it will deprive the public of the benefits of the natural gas that the Allocation Wells would provide.

In determining whether to grant a preliminary injunction, the Court must consider the possibility of harm to third parties from the injunction. *See Doe v. Calcutta*, 592 F.2d 704, 706 n.5 (3d Cir. 1979) (citing *Delaware Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 920 (3d Cir. 1974)). If the Court grants the Motion and prevents Chesapeake from drilling and operating the Allocation Wells, third party entities and individuals will be deprived of payments related to the production from the Allocation Wells to which they are entitled. *See, e.g. Cobell v. Norton*, 226 F. Supp. 2d 1, 103 (D.D.C. 2002) (noting that, in a prior decision, the court could not "enjoin this operation at this time without inflicting substantial harm on third parties and, indeed, without harming the very beneficiaries of these trust records who will have critical payments delayed by the disruption of operations that would result if the preliminary injunction issued."). If Epsilon's injunction is granted, the other working interest owners in the Cannella South JOA and the Rylee North JOA and the royalty owners in the Cannella South Unit and the Rylee North Unit will be denied payments for production from the Allocation Wells without the opportunity to participate and represent their interests.

Further, the "need for natural gas supply" is a "substantial public interest." *East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808, 826 (4th Cir. 2004). Indeed,

this Court and other courts throughout the country consider the production and dissemination of natural gas as in the public interest for purposes of evaluating requests for injunctive relief. *See Transcon. Gas Pipe Line Co. v. Permanent Easements for 5.67* Acres, 2017 WL 3412374, at \*9 (M.D. Pa. Aug. 9, 2017) (holding that public interest is served by construction of pipeline that would "give the general public access to natural gas from the Marcellus Shale deposits for heating their homes."); *Ouachita Watch League v. U.S. Forest Serv.*, 2014 WL 11498055, at \*4 (E.D. Ark. Dec. 15, 2014) ("Plaintiff's conclusory allegations of environmental harm do not outweigh the public interest in the development of natural gas resources in the forest."); *Gulf Crossing Pipeline Co. v. 86.36 Acres of Land*, 2008 WL 2465892, at \*7-\*8 (W.D. La. June 18, 2008) (holding that public interest is served by construction of a pipeline because it "will increase the overall supply of natural gas available for distribution to the public for the . . . winter heating season, providing downward pressure on natural gas prices"); *Guardian Pipeline, LLC v. 295.49 Acres of Land*, 2008 WL 1751358, at \*23 (E.D. Wis. Apr. 11, 2008) (holding that denying injunctive relief sought by pipeline would "operate against the public interest, potentially limiting the natural gas available to citizens of the region on which the pipeline is to run, and/or contributing to already high natural gas prices").

Granting the Motion would harm the other working interest owners and royalty owners in the Cannella South Unit and the Rylee North Unit because it would

deprive them of payments related to production from the Allocation Wells.  Granting the Motion would also harm the public interest because it will prevent the construction and operation of natural gas wells, the Allocation Wells, that will benefit the public interest by providing much needed natural gas supply.  There is no public interest that is served by granting the injunctive relief sought by Epsilon.

## IV.    EPSILON DOES NOT HAVE A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS BREACH OF CONTRACT CLAIMS.

Epsilon cannot establish a likelihood of success on the merits of its breach of contract claim for numerous reasons.  First, Epsilon ignores an exculpatory clause in the JOAs that absolves the operator, Chesapeake, from any liability except in the case of gross negligence or willful misconduct.  Second, Epsilon never re-submitted its proposal for the Epsilon Wells after 90 days had passed from when the parties consented to them, as it was required to under the Cannella JOAs.  Third, the Allocation Wells are not in conflict with the Epsilon Wells.  Fourth, Chesapeake was not required to propose the Allocation Wells as an alternative to the Epsilon Wells within 30 days of their proposal because Chesapeake proposed the Allocation Wells long after the proposal for the Epsilon Wells had lapsed.  Fifth, Chesapeake's proposal of the Allocation Wells conformed to the JOAs.  Epsilon chose not to consent to the Allocation Wells, thereby removing itself from further involvement in the drilling and completion of those wells.  Accordingly, Epsilon cannot claim

that its interests are being affected by the Allocation Agreement or the Allocation Wells (and, in fact, the interests are not being affected).

**A. Epsilon Cannot Meet the Stringent Standards Applied for Assessing its Likelihood of Success on the Merits.**

In the context of a commercial contract dispute, "the threshold question of whether the movant has shown a reasonable probability of success on the merits requires a substantial showing by the moving party of a present, actionable breach of contract." *Susquehanna Commercial Fin.,* 2010 WL 95127, at *5. "Where such an initial showing of an actionable breach of contract cannot be made, courts have refused to grant preliminary injunctive relief." *Id.* (citations omitted). In the absence of a clear understanding of the roles of the parties and the nature of the transactions at issue, fully informed judgments regarding the probability of success, or failure, on the merits of the claims cannot be made. *See id.* at *7.

**B. Epsilon Does Not Have a Likelihood of Success On the Merits Because Chesapeake Did Not Breach the JOAs.**

**(i) The JOAs Contain An Exculpatory Clause That Relieves the Operator, Chesapeake, From Contract Liability.**

An exculpatory clause is a "clause in a contract designed to relieve one party of liability to the other for specified injury or loss incurred in the performance of the contract." Williams & Meyers, Manual of Oil and Gas Terms, 372, 372 (2003). The JOAs contain an exculpatory clause that applies to breach of contract claims brought against the operator, Chesapeake.

Article V.A. of the JOAs states:

> Operator [Chesapeake] shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workman-like manner, with due diligence and in accordance with good oilfield practice, but *in no event* shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except as much as may result from gross negligence or willful misconduct.

(Emphasis added). The Texas Supreme Court held that this clause broadened the exculpatory scope of prior versions and applied to breach of contract actions, including "actions under the JOA that are not limited to operations."[5] *Reeder v. Wood County Energy, LLC*, 395 S.W.3d 789, 794-95 (Tex. 2012); *see also Stine v. Marathon Oil. Co.*, 976 F.2d 254, 261 (5th Cir. 1992) (holding that a prior version of this exculpatory clause extended to breaches of a JOA and to any acts done under the authority of the JOA as Operator). The court concluded that "[t]he agreed standard exempts the operator from liability for its activities unless its liability-causing conduct is due to gross negligence or willful misconduct." *Reeder*, 395 S.W.3d at 795. In reaching its holding, the court applied the fundamental contract interpretation principle, also followed by Pennsylvania courts, that the primary duty of a court is to ascertain the true intentions of the parties as expressed in the instrument. *Id.* at 794-95; *Anchel v. Shea*, 762 A.2d 346, 352 (Pa. Super. 2000) ("To

---

[5] The JOAs in *Reeder* and in this case are based on model form contracts used in the oil and gas industry. *See* 395 S.W.3d at 794.

discern the parties' intent, the court must give effect to clear and unambiguous terms without reference to matters outside the contract.").

In this case, Epsilon claims that Chesapeake has breached the JOAs by: (1) not drilling and operating the Epsilon Wells; (2) not proposing the allegedly conflicting Allocation Wells within 30 days of the Epsilon's proposal of the Epsilon Wells; and (3) planning to drill the Allocation Wells without Epsilon's consent. *See, e.g.*, Memorandum in Support of Plaintiff's Motion for Temporary and Preliminary Injunction ("Epsilon's Brief") at 14-18. Under *Reeder*, these claims of breach of contract against the operator, Chesapeake, are clearly barred by the exculpatory clause in Article V.A. of the JOAs. Nothing in the Complaint or the Motion alleges that any of Chesapeake's purported breaches are the result of gross negligence or willful misconduct. Rather, the so-called breaches are all premised on Chesapeake's purported misinterpretation of the JOAs, yet Chesapeake has complied with the JOAs. The exculpatory clause in Article V.A. of the JOAs forecloses Epsilon's breach of contract claim against Chesapeake, the operator.

> **(ii) Chesapeake Did Not Breach the JOAs By Not Drilling the Epsilon Wells Because Epsilon Did Not Re-Submit Its Proposal for Them, as Required Under the JOAs.**

Chesapeake did not breach the JOAs by not drilling the Epsilon Wells because Epsilon did not re-submit its proposal to drill those wells, as required by the JOAs, after its initial proposal lapsed. *See* Epsilon's Brief at 16-17; *United States ex rel.*

*Greenmoor, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 2009 WL 4730233, at *49 (W.D. Pa. Dec. 4, 2009) (quoting *Trumbull Corp. v. Boss Constr., Inc.*, 801 A.2d 1289, 1292 (Pa. Cmwlth. 2002)) ("[T]he party alleging breach must 'prove that [it] has performed all of [its] own obligations under the contract.'").

Under Article VI.B.1 of the JOAs, if a party desires to drill any well on the Contract Area, the party must give written notice of the proposed operation to the other parties. *See* Compl., Exhibits 2, 3, and 5. Within 30 days, the other parties must notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. *Id.* If all parties elect to participate in the proposed operation, the parties are committed to doing so "provided such operations are commenced within" 90 days. *Id.* However, "[i]f the actual operation has not been commenced within the time period provided . . . *and if any party hereto still desires to conduct said operation, written notice proposing same <u>must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made</u>.*" *Id.* (emphasis added). In short, if wells are not commenced within the 90 day period – as the Epsilon Wells were not in this case – the parties must treat the proposal as if it had never been made.

In this case, Epsilon proposed the Epsilon Wells on February 8, 2018. They were not commenced within 90-days following the expiration of the election period. *See* Compl. ¶¶ 51-52. Despite Article VI.B.1, Epsilon never re-submitted its

proposal for the Epsilon Wells to the other parties to the JOAs "as if no prior proposal had been made." *See id.*, Exhibits 2, 3, and 5; Moad Decl. ¶ 7. Based on this failure, Epsilon's proposal for the Epsilon Wells lapsed, and Epsilon cannot claim that Chesapeake breached the JOAs by not commencing operations on them. Instead, Article VI.B.1. of the JOAs *required* Chesapeake to treat the proposal for the Epsilon wells "as if [it] had [not] been made." *See* Compl., Exhibits 2, 3, and 5.

> **(iii)  Chesapeake Did Not Breach Any Required Process in the JOAs in Proposing the Allocation Wells Because the Allocation Wells and the Epsilon Wells Do Not Conflict.**

Epsilon's claim that Chesapeake failed to follow the process in the JOAs for proposing the allegedly "conflicting" Allocation Wells fails. *See* Epsilon's Brief at 17-18. This claims rests on an incorrect premise. The Allocation Wells proposal and the Epsilon Wells proposal are not "conflicting" because the Epsilon Wells proposal lapsed before the Allocation Wells proposal was ever made. Even if that were not the case, the Allocation Wells and the Epsilon Wells do not conflict because they target separate and distinct Zones as defined under the JOAs, and have no impact on the drilling and production of each other.

Under Article VI.B.6 of the JOAs, if any party desires to propose an operation that conflicts with a proposal that has already been made, the party has 30 days from the initial proposal to make an alternative proposal. *See* Compl., Exhibits 2, 3, and 5. In this case, as noted above, Epsilon's February 8, 2018 proposal of the Epsilon

Wells lapsed after June 8, 2018, which is 90-days after the election period ended and well before Chesapeake proposed the Allocation Wells on August 15, 2018. Epsilon's claim that Chesapeake was required to propose the Allocation Wells within 30 days of February 8, 2018 ignores the lapse of the Epsilon Wells proposal. Epsilon's interpretation of Article VI.B.6 of the JOAs would lead to the absurd result that *any* proposal could be considered conflicting with any prior proposal, regardless of the objecting party's lack of compliance with the JOAs or the amount of time between the proposals. *See Walney v. SWEPI LP*, 2018 WL 4076919, at *6 (W.D. Pa. Aug. 27, 2018) (noting that courts interpret contracts in a way that avoids an absurd or unreasonable result).

Further, the Allocation Wells and the Epsilon Wells do not actually conflict. Despite Epsilon's assertions, *see* Compl. ¶¶ 60-62, the Allocation Wells will not exhaust natural gas capacity or otherwise negatively impact the potential development of the Epsilon Wells. *See* Burleson Decl. ¶¶ 7-9. Additionally, the Auburn GGS and the well pad that will serve the Allocation Wells either already can accommodate, or can be expanded to accommodate, both proposals. *See id.* ¶¶ 10-15. Epsilon has not and cannot show that Chesapeake breached the JOAs by not proposing the Allocation Wells as a conflicting proposal under Article VI.B.6.

### (iv) Chesapeake Did Not Breach or "Unilaterally Amend" the JOAs in Proposing the Allocation Wells, and Epsilon's Non-Consent Precludes Further Challenge.

Both of the JOAs and Epsilon's election of non-consent to the Allocation Wells on September 14, 2018 foreclose Epsilon's claims that Chesapeake breached or "unilaterally amended" the JOA by proposing the Allocation Wells. *See* Epsilon's Brief at 14-15. The Allocation Wells are within the Contract Areas of both the Cannella South Unit and the Rylee North Unit, and therefore, Chesapeake gave notice to the parties of the Cannella South JOA and the Rylee North JOA, along with the Allocation Agreement. Under Article VI.B.1, the parties had 30 days to elect to participate in the cost of the proposed operation. On September 14, 2018, Epsilon elected not to participate in the Allocation Wells. At that point, Epsilon's involvement with respect to further planning or operation of the Allocation Wells ceased. *See* Compl, Exhibits 2, 3, and 5.

In any event, nothing in the JOAs prohibits Chesapeake from proposing and drilling the Allocation Wells across units. Under Article VI.B.1, the Allocation Wells are "on the Contract Areas" of both the Cannella South Unit and the Rylee North Unit, and therefore, Chesapeake properly proposed them pursuant to both the Cannella South JOA and the Rylee North JOA. By virtue of its non-consent, Epsilon elected to not participate in the drilling and completion of the Allocation Wells, and Chesapeake therefore does not need Epsilon's consent under the JOAs to drill the

Allocation Wells. Notably, besides Epsilon, every other party to the Cannella South JOA and the Rylee North JOA consented to the Allocation Wells. *See* Moad Decl. ¶ 14; *Susquehanna Commercial Fin.*, 2010 WL 95127, at *7 ("Susquehanna simply argues that it has clearly shown a contractual breach by VRI, but does not present proof that this view is shared by Brookeside, the entity which would be most directly and adversely affected by that breach.").

## V.    IF THE COURT GRANTS THE MOTION, WHICH IT SHOULD NOT, IT SHOULD REQUIRE EPSILON TO POST A SIGNIFICANT BOND.

In the event the Court were to grant the injunctive relief requested in the Motion, which it should not, the Court should require Epsilon to post a bond in the amount of $22,000,000. Under Fed. R. Civ. P. 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "Rule 65(c) gives the district court wide discretion to set the amount of a bond." *Transcon. Gas Pipe Line Co.*, 2017 WL 3412374, at *9. However, "there are important policies undergirding a strict application of the bond requirement in most injunction granting contexts." *Instant Air Freight Co.*, 882 F.2d at 805-06 n.9. "An incorrect interlocutory order may harm defendant and a bond provides a fund to compensate incorrectly enjoined defendants." *Id.* at 804. "[B]ecause of attenuated procedure,

an interlocutory order has a higher than usual chance of being wrong[,]" and, therefore a bond is especially important in the preliminary injunction context. *Id.*

Accordingly, "when settling the amount of security, district courts should err on the high side[.]" *Pella Prods., Inc. v. Pella Corp*, 2018 WL 2734820, at *15 (M.D. Pa. June 7, 2018) (quoting *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 456 (7th Cir. 2010)) (setting bond at $1,000,000.00 without any evidence before the court). Courts have imposed bonds "equal to two times" expected damages. *See Sabal Trail Transmission, LLC v. +/- 2.62 Acres of Land in Hamilton County Florida*, 2016 WL 3188976, at *6 (M.D. Fla. June 8, 2016) (requiring gas company to post bond "equal to two times the appraised value of the parcel" at issue). In this case, as demonstrated above, Chesapeake will suffer significant damages, in the amount of at least $10,913,824, from any delay in the construction and operation of the Allocation Wells. Thus, Chesapeake requests that the Court require Epsilon to post a bond of at least $22,000,000, which is "equal to two" times Chesapeake's lowest estimate of its damages. *See id*.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion. In the event the Court grants the Motion, the Court should require Epsilon to post a bond in the amount of at least $22,000,000.

REED SMITH LLP

Dated: October 2, 2018

/s/ Nicolle R. Snyder Bagnell
Nicolle R. Snyder Bagnell
Pa. I.D. No. 87936
Kevin C. Abbott
Pa I.D. No. 35734
Stefanie L. Burt
Pa. I.D. No. 312998
Lucas Liben
Pa. I.D. No. 309527
225 Fifth Avenue
Pittsburgh, PA 15222
Tel: (412) 288-3131
Fax: (412) 288-3063

## CERTIFICATE OF BRIEF LENGTH

I certify Defendant Chesapeake Appalachia, L.L.C.'s Brief in Opposition to Plaintiff Epsilon Energy USA Inc.'s Motion for Temporary and Preliminary Injunctive Relief complies with Local Rule 7.8 and this Court's Order extending the page limit to 8,000 words. I certify that this Brief contains 6,977 words.

/s/ Nicolle R. Snyder Bagnell

## CERTIFICATE OF SERVICE

I certify that on October 2, 2018, a true and correct copy of the foregoing Defendant Chesapeake Appalachia, L.L.C.'s Brief in Opposition to Plaintiff Epsilon Energy USA Inc.'s Motion for Temporary and Preliminary Injunctive Relief has been served by ECF upon the following individuals:

Megan S. Haines
McGuireWoods LLP
Tower Two-Sixty 260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222-3142

Michael J. Donohue
A. James Hailstone
Kreder Brooks Hailstone LLP
220 Penn Avenue, Suite 200
Scranton, PA 18503

/s/ Nicolle R. Snyder Bagnell